UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**DARLENE MILLER**,                        Case No. 4:10 CV 2852

        Plaintiff,                        Magistrate Judge James R. Knepp, II

    v.                        MEMORANDUM OPINION AND ORDER

**COMMISSIONER OF SOCIAL SECURITY,**

        Defendant.

## INTRODUCTION

Plaintiff Darlene Miller appeals the administrative denial of supplemental security income (SSI) and disability insurance benefits (DIB) under 42 U.S.C. § 1383 and 42 U.S.C. § 405, respectively. The District Court has jurisdiction over this case under 42 U.S.C. § 1383(c)(3) and 42 U.S.C. § 405(g). The parties have consented to the exercise of jurisdiction by the undersigned in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 17). For the reasons given below, the Court reverses the Commissioner's denial of benefits and remands the case for further proceedings.

## BACKGROUND

Plaintiff filed applications for DIB and SSI on October 27, 2008, alleging a disability onset date of December 7, 2007. (Tr. 109, 116). Her claim was denied initially and upon reconsideration. (Tr. 56–57, 60–62, 65–67, 69–78). Plaintiff then requested a hearing before an ALJ. (Tr. 79). Born in 1962, Plaintiff 47 was years old at the time of the ALJ's hearing. (Tr. 29, 109).

Medical History

Plaintiff's main medical problems relate to her lower back, legs, and right hand. (Tr. 136, 137, 185). She is also morbidly obese, weighing roughly 270 pounds (Tr. 218, 250, 277), and has reported being depressed (Tr. 161).

On August 20, 2007, Plaintiff suffered an electrical shock to her right hand while changing a broken light bulb at work. (Tr. 202, 261). Plaintiff went to the emergency room at Beeghly Medical Park that day, complaining of numbness in her arms and burning pain in her fingers. (Tr. 190–192). The attending physician, K. McAbee, M.D., reported moderate motor strength in each arm and leg, minimal swelling, and moderate pain (four on a scale of ten). (Tr. 191–192). Plaintiff had a normal myoglobin urine test and an EKG that showed normal sinus rhythm and borderline intraventricular conduction delay. (192–196). The final diagnosis was an electrical injury to the right hand. (Tr. 192). She was discharged with instructions to elevate, and apply ice to, the injured hand. (Tr. 197).

As instructed, Plaintiff followed up with Frank G. Farone, D.O., a few days after being seen at the emergency room. (Tr. 200). At that time, she described her hand pain as "aching" and rated it as a 3/10 in severity. (Tr. 200). Dr. Farone reported Plaintiff was "able to move [her right hand] without difficulty". (Tr. 200). He wrote:

> Right Hand: Bruising is absent. Tenderness to palpation over the thenar eminence. Swelling is not present. Movement of the hand does not cause pain. Heberden's nodes are not present. Light touch discrimination is decreased in a median distribution. Range of motion is normal. No entry or exit wounds.
>
> Right Wrist: Tenderness to palpation is not present. Swelling is not present. Range of motion is normal. Movement of the wrist does not cause pain. Forearm muscles mildly sore.

(Tr. 200). Dr. Farone explained to Plaintiff that there was no specific treatment for this kind of injury; rather, "it would take time". (Tr. 200). He restricted Plaintiff's work duty to "[n]o use of right hand" effective August 21, 2007. (Tr. 200).

Plaintiff was seen by Gordon Zellers, M.D., in April 2008 for a consultation stemming from her Worker's Compensation claim. (Tr. 202). Dr. Zellers reported Plaintiff continued "to experience

persistent right hand discomfort localized to the thenar eminence and the middle and ring fingers."
(Tr. 202–203). Plaintiff also complained of intermittent numbness and mild right hand weakness.
(Tr. 203). On examination, Dr. Zellers noted mild tenderness with palpation to the thenar eminence
and to the dorsal surface of the thumb, but no deformities or muscle spasms. (Tr. 203). He said
motor testing showed "a mild decrease in right grip strength", but distal sensory, pulse, capillary
refill, and tendon functions, were normal. (Tr. 203). Dr. Zellers conducted extensive range of motion
testing on the right hand and reported various amounts of permanent partial impairment for each
finger. (Tr. 203–204). In conclusion, he calculated Plaintiff has "a 4% permanent partial impairment
of the right hand, which converts to a 4% permanent partial impairment of the right upper
extremity". (Tr. 204). Using the AMA's guidelines on permanent impairments, Dr. Zellers said
Plaintiff's injury amounts to "a 2% permanent partial impairment of the whole man". (Tr. 204).

In November 2008, Plaintiff went to the emergency room at St. Elizabeth Health Center
complaining of back spasms. (Tr. 215). The attending physician noted a clinical impression of
apparent lumbar radiculopathy. (Tr. 217). Plaintiff was discharged with a prescription and instructed
to follow up with a physician in one to two days if her symptoms persisted. (Tr. 217).

Plaintiff presented to the Pain Center at St. Elizabeth Health Care Center in January 2009
for an evaluation. (Tr. 218). The physician's assistant who examined her noted decreased strength
to the right lower extremity proximal and distal, and a positive straight-leg raising test on that side.
(Tr. 218). He also reported Plaintiff had difficulty rising from lying to sitting because of pain. (Tr.
218). Diagnostic MRI imaging from 2005, according to these records, showed disc degeneration and
facet hypertrophy at L3-L4 and L5-S1, and narrowing to the spinal canal and compromise of both
lateral recesses at L3-L4. (Tr. 219). Plaintiff, he wrote, "seems to be suffering from lumbar spine

3

stenosis with right L3 radiculopathy [and] facet arthropathy at the level of L4-L5, L5-S1, right worse than the left." (Tr. 219). Lumbar steroid epidural injections were recommended. (Tr. 219).

Pursuant to the Pain Center's evaluation, whole-body scans were conducted on Plaintiff to assess her for lumbar facet syndrome. (Tr. 220). The physician interpreting the scans, Jesus A. Bianco, M.D., concluded the images "indeed establish the diagnosis of active inflammatory facet disease on the right side of L4." (Tr. 220).

In March 2009, Plaintiff underwent an MRI of her lumbar spine. (Tr. 225). William Crawford, M.D., reported it showed degeneration at L3-L4 with a right paracentral protrusion and mild central canal stenosis, and degeneration at L5-S1 with a shallow right-sided protrusion but no stenosis. (Tr. 226). There were no fractures, subluxation, or destructive lesions seen on the MRI. (Tr. 226).

Plaintiff began seeing Consuelo A. Mendez, M.D., on a consistent basis in mid-2009. (Tr. 293–295). Dr. Mendez reported in March 2009 that Plaintiff was "unable to sit on examining table" and "[u]nable to do measured bending." (Tr. 250). He reported constant pain at a 7/10 level, making it difficult to stand or sit, and "almost impossible to get in and out of a vehicle." (Tr. 250). Upon his referral, Plaintiff attended twelve physical therapy sessions in March and April 2009. (Tr. 231–248). Records show she was compliant with the therapy. (Tr. 231, 232, 236, 239, 243, 245). Her prognosis began as "good" (Tr. 248), but she did not respond well as her spasms increased with increased exercise (Tr. 231). Lori Lender, MPT, discharged Plaintiff from physical therapy to see a specialist, with a "fair" discharge prognosis. (Tr. 231).

In May 2009, Plaintiff attended a surgical weight loss workshop about procedures offered at the Cleveland Clinic Weight Management Center. (Tr. 292). Two months later, Plaintiff presented

4

to Tamara Kindelan, M.D., and Philip R. Schauer, M.D., for her morbid obesity. (Tr. 276). Dr. Kindelan's notes indicate Plaintiff had a body mass index of 44. (Tr. 276). Dr. Schauer assessed her for a possible bariatric surgery, concluding that she met the NIH criteria for such an operation. (Tr. 278). However, Plaintiff's insurance required a nine-month medically-supervised diet program before authorizing bariatric surgery. (Tr. 278). Plaintiff therefore began a medically-supervised diet, and Dr. Schauer referred her for a preoperative evaluation while on the diet. (Tr. 278). Hanna B. Freyle, M.D., then evaluated Plaintiff to offer a second opinion on her suitability for bariatric surgery. (Tr. 282). She concluded Plaintiff was "in optimal condition to proceed with surgery", pending a review of laboratory data. (Tr. 285).

Pursuant to Dr. Schauer's referral, Plaintiff underwent  psychological evaluation in the process of preparing for a potential gastric bypass surgery. (Tr. 264). Psychologist Amy Windover, Ph.D., concluded Plaintiff had a fair understanding of the surgery's benefits, but poor knowledge of its risks. (Tr. 265). Dr. Windover referred Plaintiff for psychological testing and to a substance risk reduction group. (Tr. 268). Psychologist Kathleen Ashton, Ph.D., also assessed Plaintiff as part of the preoperative evaluation, and concluded Plaintiff has psychological factors affecting her morbid obesity. (Tr. 262).

Plaintiff completed multiple psychological tests at the Bariatric and Metabolic Institute. (Tr. 272). The tests showed significant emotional distress, but no thought dysfunction or significant behavioral dysfunction. (Tr. 272). Her profile reflected sadness, dysphoria, and dissatisfaction with her circumstances. (Tr. 272). She reported a general sense of malaise manifested by poor health, and lacking confidence. (Tr. 273). Dr. Windover determined Plaintiff's test results were inconsistent with her presentation during a clinical interview. (Tr. 274). Plaintiff then continued psychotherapy

5

with Dr. Windover in the fall of 2009. (Tr. 303). The purpose of this was to address her understanding of the risks and realistic post-surgical expectations and lifestyle modifications. (Tr. 304).

In the fall of 2009, Plaintiff developed plantar fasciitis/heel spur syndrome on her right foot. (Tr. 299). This was confirmed with x-rays, then treated with injections and orthotics. (Tr. 299). Plaintiff reported not having any pain in her foot as a result of the treatment. (Tr. 299). In October of that year, Dr. Mendez ordered a right knee ultrasound to determine if Plaintiff had a Baker's cyst. (Tr. 321). The ultrasound was normal, producing no evidence of a Baker's cyst. (Tr. 321). Dr. Mendez also ordered various blood and heart tests, none of which were determined to show significant illnesses. (Tr. 315–320).

Around the same time, Dr. Mendez began consistently reporting pain and back spasms. (Tr. 295, 307, 308, 310, 311, 313, 314, 325). At one point, in January 2010, Dr. Mendez noted Plaintiff had spasms and daily pain, and was walking with a cane. (Tr. 306). He wrote, "Very limited forward bending." (Tr. 306). Later, Dr. Mendez reported Plaintiff had a "very hard time ambulating or even sitting. . . . Very difficult to sit [and] get up from chair[.]" (Tr. 307). Dr. Mendez also noted Plaintiff was watching her diet closely during this time, and was exercising at home. (Tr. 309, 311). He considered her a "very compliant and motivated" patient, having kept a "very detailed food diary" during her medically-supervised diet. (Tr. 311, 314). Plaintiff stayed enthusiastic and receptive, according to Dr. Mendez's notes. (Tr. 314).

In November 2009, Mark D. Elderbrock, M.D., wrote a letter for Plaintiff describing her work limitations. (Tr. 296). In it, he explained that he had treated Plaintiff for diabetes, poly-neopathy, carpal tunnel syndrome, and arthritis. (Tr. 296). He wrote, "It is my medical opinion,

6

based on my examinations of [Plaintiff], that she is significantly limited in the use of her hands. .

. . Specifically[,] she is limited to only occasionally gripping and grasping bilaterally." (Tr. 296).

Plaintiff continued with various tests and consultations in the hopes of qualifying for pre-operative clearance for bariatric surgery, returning to Dr. Schauer in January 2010. (Tr. 300). At that point, she was in her eighth month of the nine-month required medically-supervised diet. (Tr. 301). Dr. Schauer noted that she had been cleared by psychology, and concluded she was "an excellent candidate for surgery." (Tr. 301). However, the transcript includes no indication the surgery was ever performed.

Dr. Mendez referred Plaintiff for more physical therapy in April 2010. (Tr. 330–345). This time, physical therapist Gheorghly Kolosovsky initially reported no change in Plaintiff's symptoms. (Tr. 343, 344). Later on, Kolosovsky reported a slight decrease in Plaintiff's thigh pain, though also an increase in her spasms. (Tr. 342). As therapy continued, Plaintiff's symptoms increased with resistance. (Tr. 339, 340). After several weeks, Kolosovsky reported Plaintiff had a "good tolerance to exercises without increased symptoms." (Tr. 338). After about three weeks, Plaintiff was said to "demonstrate[] gradual improvement". (Tr. 336). Finally, in mid-May 2010, Plaintiff began reporting a burning down her front to her thigh. (Tr. 330, 331). At this point, Plaintiff also complained of radiating pain to Dr. Mendez, who noticed tenderness on examination. (Tr. 325). He then referred her for a consult about her degenerative disc disease and spinal stenosis. (Tr. 325).

Plaintiff has had her physical residual functional capacity (RFC) evaluated multiple times. First, in January 2009, consultant physician W. Jerry McCloud, M.D., conducted a physical RFC assessment. (Tr. 205–212). Dr. McCloud determined Plaintiff could occasionally lift or carry 20

pounds, frequently lift or carry ten pounds, and sit, stand, or walk for about six hours in an eight-hour workday. (Tr. 206). Dr. McCloud concluded Plaintiff has a limited ability to push or pull with her upper extremities, and is limited to occasional handling, fingering, and feeling with her right hand, making an RFC that allows for light one-handed jobs appropriate. (Tr. 207–208). He relied heavily upon Dr. Zellers' assessment as well as SSA reports from people who interviewed Plaintiff "and observed no difficulties with standing, walking, sitting, using her hands, etc." (Tr. 207). He remarked that while Plaintiff claims she "get[s] paralyzed sometimes from [her] lower back injury", "[n]othing in the file suggests any back problems." (Tr. 210).

Second, in July 2009, Gerald Klyop, M.D., conducted another physical RFC assessment. (Tr. 254–261). Dr. Klyop concurred that Plaintiff could occasionally lift or carry 20 pounds and frequently lift or carry ten pounds. (Tr. 255). However, his assessment of Plaintiff's standing or walking ability was more restrictive than Dr. McCloud's. That is, Dr. Klyop determined Plaintiff could stand or walk for at least two hours in an eight-hour workday. (Tr. 255). He also disagreed with Dr. McCloud that Plaintiff is limited in her pushing and pulling ability, reporting an unlimited pushing and pulling ability. (Tr. 255).

Unlike Dr. McCloud, Dr. Klyop had the benefit of records about Plaintiff's lower back injury. (Tr. 255). He said due to Plaintiff's back problems, she is limited to standing or walking no more than four hours in an eight-hour workday. (Tr. 255). But Dr. Klyop also said Plaintiff's statements regarding symptoms are partially consistent with the medical evidence in the file. (Tr. 259). While she says she ambulates with a cane, Dr. Klyop noted, "medical evidence did not indicate doctor prescribed cane. As such, [Plaintiff's] statements regarding symptoms [were] not fully supported by received medical evidence." (Tr. 259). It is evident from Dr. Klyop's report that he

8

thoroughly reviewed all of the treatment records in the file to come to his conclusion. (Tr. 261).

Third, Plaintiff's primary care physician, Dr. Mendez, filled out a physical RFC assessment in April 2010. (Tr. 297–298). In it, he wrote Plaintiff can only lift or carry a maximum of five pounds, either frequently or occasionally. (Tr. 297). He also reported Plaintiff can only sit, stand, or walk a total of less than one hour during an eight-hour workday. (Tr. 297). Further, he said she is limited to rare or no climbing, balancing, stopping, crouching, kneeling, crawling, pushing, and pulling. (Tr. 297–298). He concluded she could occasionally reach, handle, and do fine or gross manipulation. (Tr. 298). Similarly, he determined she could perform frequent feeling. (Tr. 298). Dr. Mendez also noted a cane and transcutaneous electrical nerve stimulator (TENS) unit had been prescribed for Plaintiff. (Tr. 298). When asked to rate Plaintiff's pain, Dr. Mendez said she experiences severe pain. (Tr. 298). This RFC assessment was based on Dr. Mendez's physical examinations of her. (Tr. 297).

Administrative Hearing

Plaintiff appeared with counsel at the hearing before the ALJ on June 14, 2010. (Tr. 27). Also appearing was George Starosta, a vocational expert (VE). (Tr. 27).

Plaintiff testified she has a twelfth grade education and lives with her thirteen year-old son. (Tr. 29, 35). Since her alleged onset date, she performed part-time work as a transporter of patients. (Tr. 30). She said she decided to stop working this job when she was transferred to physical therapy, though this first round of physical therapy was not helpful. (Tr. 30). Plaintiff testified she was evaluated for a gastric bypass but was denied by her insurance because the proper documentation was not submitted on her behalf. (Tr. 33–34).

The ALJ asked Plaintiff whether she thought she could work as a movie theater ticket taker

for eight hours a day, five days a week. (Tr. 30–31). Plaintiff responded she could not. (Tr. 31). She explained she would not be able to do such a job because she is not able to stand more than 20 minutes at time due to a shooting pain in her back, buttocks, and leg. (Tr. 31). This pain is so severe, Plaintiff testified, it brings tears to her eyes. (Tr. 32). And while sitting, she is unable to relax her back, so she experiences constant pain. (Tr. 31). She described this back pain as either an eight or a ten on a scale of zero to ten. (Tr. 31). Additionally, Plaintiff testified she has constant pain down her right forearm that would prevent her from working as a ticket taker. (Tr. 33).

Plaintiff also explained that her dominant hand was electrocuted at work in 2007, and as a result, she lacks feeling in it "except for down in the joints when it gets inflamed. The skin part feels numb and dead", and she is unable to lift or grip anything with it. (Tr. 32, 40). For example, she said she cannot eat or operate a remote control with this hand. (Tr. 33).

Plaintiff testified about her residual capabilities. When asked what she can do in a typical day, Plaintiff said she is able to get dressed but "that's a task." (Tr. 36). She testified she cannot cook because of her dominant hand issues. (Tr. 36). She keeps her shoes untied because she cannot tie them, though she can button a button using her left hand. (Tr. 36–37). She also said she does drive, though "mostly to the doctor and to physical therapy", who are in the same building. (Tr. 37–38). Plaintiff uses her TENS unit daily at home, but she testified it is not effective. (Tr. 39). To get around, she uses a cane and holds onto the banisters and walls. (Tr. 39). Plaintiff further testified she has difficulty using the restroom because of her dominant hand problems. (Tr. 41).

Plaintiff testified her concentration is disrupted by her pain. (Tr. 41). She said she has feelings of sorrow for herself, but when asked whether she sees a counselor or psychiatrist, she said no. (Tr. 42). Instead, Plaintiff said she goes to church and talks to her pastor and "church family",

10

all of whom encourage her. (Tr. 42). She also attends physical therapy for her back. (Tr. 39). When asked about triggers for her pain, Plaintiff said she keeps her foot elevated past her hips "almost in a reclining position . . . mostly all day" in order to prevent the pain. (Tr. 38). Another thing preventing her from working, she said, is the fact her medications make her dizzy and nauseous every three to four hours. (Tr. 35).

The ALJ made specific inquiry into Plaintiff's hand injury. (Tr. 43). Plaintiff testified she made a Worker's Compensation claim for it and settled it for a lump sum. (Tr. 43). Because Plaintiff was hurt four different times at work, she could not precisely remember which amount she resolved the claim for, but thought it was either $750 or $3,000. (Tr. 43).

The VE classified Plaintiff's past work as an energy conservation representative as medium exertional and semi-skilled. (Tr. 44). He said her mailroom, hall monitor, and office helper jobs were all light, unskilled positions. (Tr. 44). Finally, he said her patient escort job was a medium, unskilled position. (Tr. 44). The ALJ then asked him to assume a hypothetical individual with Plaintiff's education, training, work experience, and having varying restrictions. (Tr. 44).

In the first hypothetical, the individual could lift ten pounds occasionally, three to five pounds more frequently; could sit for four hours; could stand or walk for four hours; would be limited to occasional use of both hands for grasping or fine fingering work; would be afforded the option to sit or stand, changing positions at a maximum frequency of every 30 minutes; and could not crouch, crawl, or climb, with other postural maneuvers performed only occasionally. (Tr. 44–45). Such an individual, the VE testified, could perform the jobs of a telemarketer, a telephone information clerk, or a receptionist. (Tr. 45). These positions are classified by the DOT as sedentary and semi-skilled, though the VE testified he finds "these jobs are commonly performed unskilled."

11

(Tr. 45). Each of these jobs accounts for more than 100,000 positions in the national economy. (Tr. 45).

For the second hypothetical, the individual had the same restrictions except she could not use her dominant right hand at all, would be able to use her left hand only occasionally, could stand for fifteen minutes at a time, and would need to change between sitting and standing frequently. (Tr. 45–46). The VE testified this set of assumptions eliminates the telemarketer job, and erodes the availability of information clerk and receptionist jobs to about 10,000. (Tr. 46). The VE was "hard pressed to identify other jobs that would fit otherwise." (Tr. 46).

After further questioning by Plaintiff's attorney, the VE said there would be no work available for an individual who had to miss two or more days of work a month due to pain. (Tr. 49). He also testified there would be no work available for an individual whose pain level caused her to be off task ten percent or more of the work shift. (Tr. 49).

### STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a

12

preponderance of the evidence supports a claimant's position, the Court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### STANDARD FOR DISABILITY

Eligibility for DIB and SSI is predicated on the existence of a disability. 42 U.S.C. §§ 423(a)(1)(E), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process – found at 20 C.F.R. §§ 404.1520 and 416.920 – to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to

13

establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The Court considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)–(f), 416.920(b)–(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

The ALJ issued a decision denying benefits on June 24, 2010. (Tr. 11–20). Plaintiff then requested review of the ALJ's hearing. (Tr. 6). The Appeals Council denied her request for review, making the ALJ's determination the final decision of the Commissioner. (Tr. 1). Plaintiff now challenges the ALJ's decision, asserting three arguments: (1) the ALJ failed to assign the appropriate weight to the opinions of Plaintiff's treating physician; (2) the ALJ's RFC finding was unsupported by substantial evidence; and (3) the ALJ failed to resolve conflicts between the Dictionary of Occupational Titles and the VE's testimony. These arguments are addressed in turn.

Treating Physician Rule

Plaintiff contends the ALJ improperly weighed the opinions of Dr. Mendez, one of Plaintiff's treating physicians. Generally, the medical opinions of treating physicians are accorded greater deference than non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96-2p, 1996 WL 374188. "Because treating physicians are 'the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone,' their opinions are generally accorded more weight than

14

those of non-treating physicians." *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)). A treating physician's opinion is given "controlling weight" if supported by "medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the case record." *Id.* The ALJ must give "good reasons" – reasons "sufficiently specific to make clear . . . the weight [given] to the treating source's medical opinion and the reasons for that weight" – for discounting a treating physician's opinion. *Id.*; 20 C.F.R. § 404.1527(d)(2). Failure to do so requires remand. *Blakely*, 581 F.3d at 409–410.

Under the regulations, a "treating source" includes physicians, psychologists, or "other acceptable medical source[s]" who provide, or have provided, medical treatment or evaluation and who have, or have had, an ongoing treatment relationship with the claimant. 20 C.F.R. § 404.1502. A medical provider is not considered a treating source if the claimant's relationship with them is based solely on the claimant's need to obtain a report in support of their claim for disability. 20 C.F.R. § 404.1502.

In this case, the ALJ offered the following analysis regarding treating source opinions:

[T]he opinion . . . relating to the [Plaintiff]'s limitation to occasional gripping and grasping is given significant weight and accommodated in the medical record. This limitation, as noted by Dr. Mendez in his April 2010 [report] is also given significant weight as well as the need for a sit/stand option. The remainder of Dr. Mendez's May 2009 and April 2010 reports are only given some weight. As noted above, the medical record does not support more significant limitations than are noted in the residual functional capacity. The [Plaintiff]'s subjective complaints regarding the pain in her leg, back, and arm and the difficulty with her hands were not entirely credible as she was capable of participating in an exercise program to lose weight, had declined an earlier orthopedic consultation, and was capable of occasionally using her hands for gripping and grasping. [Plaintiff] testified that she could not use her hands to eat nor operate a remote control. The medical evidence of record establishes some limitation in the use of her hands but not to the extreme extent alleged by [Plaintiff]. [Plaintiff] testified that she settled her Workers Compensation claim for her hand injury for only $750.00. This [is] completely incongruent with the loss of the ability to use her hands. There is also medical evidence that [Plaintiff]

15

exercised using weights in her hands. This extreme variance between [Plaintiff]'s testimony, her own testimony and the medical evidence of record, undermines her credibility in what she told her providers and this court. When the ALJ asked [Plaintiff] what she was able to do towards household chores, emphasizing that he was asking her what she can do, [Plaintiff] gave a long litany of what she cannot do and what other people do for her rather than answer this simple and clear question. This demonstrates that [Plaintiff] has a propensity to exaggerate her symptoms and renders her complaints to Dr. Mendez suspect. Dr. [Mendez] referred [Plaintiff] for orthopedic treatment but [Plaintiff] refused. Although [Plaintiff] made complaints of very debilitating pain to Dr. Mendez, this physician did not increase her pain medication. Dr. Mendez's statements are contradicted by the opinion of the state agency physician. The RFC does limit [Plaintiff] to sedentary work to accommodate a more realistic assessment of her subjective complaints. For all of these reasons I do not give the statements of Dr. Mendez much weight.

(Tr. 18) (citations omitted).

There is no question here that Dr. Mendez was a treating source under the regulations. He provided medical treatment and had an ongoing treatment relationship with Plaintiff for more than a year, during which time he saw her regularly. (Tr. 293–295, 306–321, 325). During this time, Dr. Mendez completed a physical RFC assessment form, in which he said Plaintiff could only lift or carry five pounds, could rarely or never push, pull, climb, balance, stoop, crouch, kneel, or crawl, and could only sit, stand, or walk for less than one hour during an eight-hour workday. (Tr. 297–298). Dr. Mendez concluded Plaintiff could perform frequent feeling, and occasional reaching, handling, and fine or gross manipulation. (Tr. 298). He also classified the pain Plaintiff experiences as severe. (Tr. 298). The RFC determination the ALJ made was somewhat inconsistent with this assessment, as the ALJ determined Plaintiff could lift or carry ten pounds occasionally and sit or stand for four hours in an eight-hour workday. (Tr. 15). As the ALJ's opinion says, the statements of Dr. Mendez were not given "much weight". (Tr. 18).

Unlike some cases where a treating physician's opinion can be discounted because it was not about the claimant's residual capacity, *see Watts v. Comm'r of Soc. Sec.*, 179 F. App'x 290, 294 (6th

16

Cir. 2006) ("[N]one of [plaintiff's] doctors . . . made detailed functional capacity analyses, which leaves the functional capacity forms from the medical reviewers as the best evidence."), Dr. Mendez rendered opinions specifically about Plaintiff's RFC. (Tr. 296–298). Therefore, there is no way around the necessity of providing "good reasons" before giving his opinions about Plaintiff's RFC less than controlling weight.

The "good reasons" given by an ALJ to discount a treating source's opinion must be "supported by the evidence in the case record". *Blakley*, 581 F.3d 399, 406–407 (quoting SSR 96-2p, 1996 WL 374188, at *5). A failure to follow this procedural requirement "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Id.* (citing *Rogers*, 486 F.3d at 243). Thus, because the ALJ gave less than controlling weight to some aspects of Dr. Mendez's RFC assessment, the Court will examine the reasons given for this weight to ensure they are supported by substantial evidence in the record.

To begin with, the ALJ cited the fact that, despite Plaintiff's consistent complaints of disabling pain, Dr. Mendez did not increase her pain medication. (Tr. 18). Though the appropriate medications, and amounts thereof, that should be prescribed to a patient is a medical judgment the ALJ is not qualified to second-guess, the case law in this circuit makes clear that an ALJ may cite a treating physician's modest treatment regimen as a "good reason" for discounting their opinions. *Helm v. Commissioner of Soc. Sec.*, 405 F. App'x 997, 1001–1002 (6th Cir. 2011) (finding the ALJ's opinion that a treating physician's modest treatment regimen, consistent solely of pain medication, was inconsistent with a finding of total disability to be a "good reason" for discounting the treating physician's opinion); *see also Myatt v. Commissioner of Soc. Sec.*, 251 F. App'x 332, 335 (6th Cir. 2007) ("Dr. Kleykamp's modest treatment regimen for [the claimant] is inconsistent with a diagnosis

of total disability."). Here, though, it is not exactly fair to the record to characterize Dr. Mendez's treatment regimen for Plaintiff as modest, let alone "conservative", as the ALJ put it. (Tr. 18). Dr. Mendez referred Plaintiff to physical therapy twice (Tr. 231–248, 330–345), referred her to the Pain Center at St. Elizabeth Health Care Center (Tr. 218–219), recommended both an orthopedic consultation (Tr. 312) and a consultation with a specialist for her spinal problems (Tr. 325), and kept her on a hefty dose of vicodin for her pain (Tr. 306, 307; see below). In terms of how Dr. Mendez perceived Plaintiff's symptoms, his impression that she has significant RFC restrictions is almost incontrovertible; he put unmistakable emphasis in his treatment notes about the severity of Plaintiff's limitations, such as his frequent use of extreme modifiers like "very" when describing his observations and her symptoms: "Very difficult to get up from chair" (Tr. 312); "in a lot of pain, uses TENS everyday . . . seems in pain" (Tr. 314); "very tender" (Tr. 295, 306, 307); "ambulates w[ith] cane w[ith] great difficulty[,] very difficult to sit [and] get up from chair" (Tr. 307).

More importantly, contrary to the ALJ's contention, the record does *not* show that Dr. Mendez never increased Plaintiff's pain medication. The same month of his RFC assessment, in April 2010, Dr. Mendez noted Plaintiff takes "vicodin PRN, needs relief in PM." (Tr. 306). Six days later, Dr. Mendez made a three-word entry in his notes: "Vicod[i]n TID #90". (Tr. 306). PRN and TID are commonly used medical abbreviations meaning "as needed" and "three times per day", respectively.[1] Thus, the record establishes Dr. Mendez directed Plaintiff to take vicodin three times per day rather than merely "as needed". This change was brought on by Plaintiff needing pain relief

---

1. Dan J. Tennenhouse, ATTORNEY'S MEDICAL DESKBOOK 4TH, §§ 5:18, 5:22. The Court takes judicial notice of these common medical abbreviations. *See Neathery v. Chevron Texaco Corporation Group Accident Policy No. OK 826458*, 2009 WL 3199173, at *13 (S.D. Cal. 2009) (taking judicial notice of the commonly accepted medical abbreviations CP, SOB, and N/V/D/C).

in the evening while taking vicodin only "as needed". In light of this, the Court cannot say there is substantial evidence supporting the finding that Dr. Mendez never increased Plaintiff's pain medication. In sum, the Court is not convinced that the amount of pain medication Dr. Mendez prescribed is a "good reason" for discounting his opinion about Plaintiff's RFC.

Course of treatment aside, the ALJ offered other reasons for discounting the statements of Dr. Mendez. That is, the ALJ pointed out Dr. Mendez's opinion was contradicted by both reviewing consultant physicians. (Tr. 18). Moreover, the ALJ observed that other medical evidence in the record indicates Plaintiff exercised with weights in her hands. (Tr. 18). These facts, the ALJ reasoned, in combination with the fact that Plaintiff settled her hand injury Workers Compensation claim for only $750, tend to undermine Dr. Mendez's RFC assessment that limits Plaintiff to lifting only five pounds. (Tr. 18).

These reasons given for discounting Dr. Mendez's opinion are nonetheless troublesome. First, with respect to Plaintiff using hand weights for exercise, the record shows Plaintiff exercised in a chair with two-pound weights in her hands. (Tr. 312). This does not contradict Dr. Mendez's opinion that she could frequently lift or carry up to five pounds (Tr. 297); in fact, it is fully consistent with Dr. Mendez's RFC assessment. Furthermore, there is considerable evidence in the record showing Plaintiff's spasms or pain increased when she exercised. (Tr. 233, 235, 236, 239, 240, 243, 261, 330–332, 340–343). Plaintiff's exercise therefore does not undermine Dr. Mendez's RFC assessment.

Second, there are records of two Workers Compensation claim settlements in the transcript: one for $750 (Tr. 132), and one for $3,500 (Tr. 131). Plaintiff testified she could not remember which payment was for her hand injury. (Tr. 43). Both payments were made in the same month:

19

March 2009. (Tr. 131–132). To compound the issue, neither settlement record specifies to which injury it applies. (Tr. 131–132). In all, there is no evidence in the record that the $750 payment, as opposed to the $3,500 payment, was for Plaintiff's hand injury. Therefore, this reason is not supported by substantial evidence in the record and cannot be a "good reason" to discount Dr. Mendez.

Third, the fact that two consulting physicians disagreed with Dr. Mendez is not, by itself, a "good reason" that satisfies the treating physician rule; rather, it is the reason *for* the rule in the first place. Though consulting physician reports can be given considerable weight, the consulting physicians in the record, unlike Dr. Mendez, did not have the benefit of an ongoing treatment relationship with Plaintiff. *See* 20 C.F.R. § 416.927(d). Not to mention, Dr. McCloud did not even have all of Plaintiff's medical records when he made his RFC determination, noting that there was nothing in the file he reviewed suggesting any back problems. (Tr. 210, 211). Such a clearly erroneous opinion (see Tr. 218–219, 225–226, 325 for medical evidence of Plaintiff's back problems) could not be used as a "good reason" anyway. *See Blakely*, 581 F.3d at 409 (finding a consultant physician's opinion insufficient to be afforded greater weight than a treating physician's opinion when the consultant physician's opinion was based on a review of an incomplete case record). And the fact the ALJ ultimately contradicted Dr. Klyop's determination that Plaintiff could occasionally lift 20 pounds and sit for about six hours a day (Tr. 15 – the ALJ found Plaintiff could only lift ten pounds occasionally and sit for four hours a day) seriously undermines the argument that Dr. Klyop's disagreement with Dr. Mendez is so reliable as to be a "good reason" to discount the latter's opinion.

A fourth reason given by the ALJ for discounting Dr. Mendez's opinion is that it appears to

20

be based primarily on her subjective complaints, which the ALJ deemed to be not credible. (Tr. 18). The ALJ was within his discretion in making this credibility determination, noting reasons such as her propensity to focus on what she cannot do rather than respond to a question about what she can do. (Tr. 18). The Commissioner argues the fact that a treating physician's opinion appears to be based solely on a claimant's subjective complaints, as opposed to accepted clinical and laboratory techniques, can be a "good reason" to discount their opinion, citing *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876–877 (6th Cir. 2007). In *Smith*, the Sixth Circuit determined that because substantial evidence supported the ALJ's finding that the claimant's subjective complaints were not credible, the ALJ was within his discretion to reject treating source opinions formed "solely" from the claimant's reporting of her symptoms and conditions. *Id.* at 877. This stems from the regulations, which provide that a treating source's opinion is given controlling weight unless it is either not "well-supported by medically acceptable clinical and laboratory diagnostic techniques" or "inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2).

Because the ALJ in this case found Plaintiff's subjective complaints not credible (Tr. 18), under *Smith* he was entitled to discount any opinion formed solely from those subjective complaints. The question, then, is whether the discounted opinions of Dr. Mendez were formed solely on Plaintiff's subjective complaints.

In the RFC assessment form Dr. Mendez filled out, every question asked, "What are the medical findings that support this assessment?" (Tr. 297–298). Dr. Mendez's response to this aspect of every question was either simply "physical exam" or "Hx and physical exam". (Tr. 297). For the question about Plaintiff's lifting and carrying ability, Dr. Mendez based his conclusion of a five pound limit on his "physical exam". (Tr. 297). For the questions about standing, walking, sitting,

21

and postural activities, his response was some variation of "Hx and physical exam". (Tr. 297–298). In other words, Dr. Mendez based most of his RFC assessment on a combination of Plaintiff's medical history and his physical examination of her.

Unfortunately for any adjudicating reviewer of this case, Dr. Mendez's treatment records are sometimes sparse and extraordinarily difficult to read. They are hand-written and at times completely illegible. No doubt this does a disservice to Plaintiff, as the ALJ probably had difficulty deciphering Dr. Mendez's treatment notes. But the Court has made great efforts to read them, and has found evidence showing he did, in fact, base his opinions on clinical observations, and not "solely" on Plaintiff's subjective complaints.

Even though Dr. Mendez always made notes of Plaintiff's subjective complaints during office visits, he also always made notes of his observations and findings from a physical exam, denoted by his abbreviation "P.E.". (Tr. 293–295, 306–314). In this section of his notes, he frequently reported finding Plaintiff's knees or back to be tender or "very tender". (Tr. 295, 306, 307, 309, 310, 311, 313, 314). One time, a month before his RFC assessment, he reported finding edema. (Tr. 308). Similarly, he clinically observed Plaintiff's ability to ambulate, and made notes in his "P.E." findings such as "seems in pain" (Tr. 306, 314), "[v]ery limited forward bending" (Tr. 306), and "ambulates w[ith] cane w[ith] great difficulty[,] very difficult to sit [and] get up from chair, [illegible] due to pain" (Tr. 307), and "very difficult to get up from chair" (Tr. 312). These are not recitations of Plaintiff's subjective allegations, but, rather, clinical observations of Plaintiff's physical abilities and condition during the examination.

The Court is convinced, based on theses records, that Dr. Mendez did not form his RFC assessment solely on Plaintiff's subjective allegations, and the ALJ's determination that he did is

unsupported by substantial evidence. To the contrary, Dr. Mendez clinically observed Plaintiff's difficulty to stand, sit, and walk, and discovered tenderness and edema on physical examination of her. He would not have written "seems in pain" multiple times if he were basing his conclusions merely on Plaintiff's subjective allegations; he was, in fact, lending credibility to her subjective complaints of pain based on his examinations' findings. This is what he was referring to when he wrote "physical exam" for the basis of his RFC conclusions. The ALJ should have deferred to Dr. Mendez's opinion.

Dr. Mendez's RFC assessment should have been given controlling weight under 20 C.F.R. § 404.1527(d)(2) without other reasons given for a lesser weight. Given the fact Dr. Mendez was the physician most familiar with Plaintiff's impairments when he filled out the RFC assessment, and the record shows he based his opinions on his clinical observations during his ongoing treatment relationship with Plaintiff, the treating physician rule required deference to his opinion absent good reason. As the Court has analyzed, the ALJ did not give good reasons for discounting this opinion. Therefore, remand is necessary. *See Blakely*, 581 F.3d at 409–410.

RFC Determination

Plaintiff argues the ALJ's RFC finding was not supported by substantial evidence. The ALJ determined Plaintiff has the following RFC:

> I find that [Plaintiff] has the residual functional capacity to perform sedentary work as defined in 20 C.F.R. § 404.1567(a) and § 416.967(a) except that [Plaintiff] can lift 10 pounds occasionally, three to five pounds more frequently, sit for four hours out of an eight hour work day, stand for four hours out of an eight hour work day, and is limited to occasional use of the hands for grasping or fine fingering work. She must also be afforded a sit/stand option, changing positions at a maximum frequency of once every thirty minutes. She must not crouch, crawl, or climb, but can perform other postural movements occasionally.

(Tr. 15). The ALJ determined Plaintiff's statements concerning the intensity, persistence, and

23

limiting effects of her symptoms are not credible to the extent they are inconsistent with this RFC. (Tr. 16).

The Court presently declines to review this RFC determination. Because the ALJ gave improper weight to the opinions of Dr. Mendez, a new RFC determination must be made giving his opinions controlling weight (or stating good reasons for discounting them). Therefore, challenges to the RFC determination already made are moot.

Conflicts Between the Dictionary of Occupational Titles and the VE's Testimony

Finally, Plaintiff argues the ALJ failed to comply with SSR 00-4p by not asking the VE if his testimony was consistent with the Dictionary of Occupational Titles (DOT). Because the VE's testimony was inconsistent with the DOT, Plaintiff argues, the ALJ's failure to resolve the conflicts between the DOT and the VE's testimony is cause for remand.

Generally speaking, the Sixth Circuit has made it abundantly clear that a VE's testimony identifying specific jobs available in the regional economy that an individual with the claimant's limitations could perform can constitute substantial evidence supporting a Step Five determination that the claimant can perform other work. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 549 (6th Cir. 2004). Nonetheless, Social Security Ruling 00-4p imposes an affirmative duty on the ALJ when a VE's testimony is inconsistent with the DOT:

> Occupational evidence provided by a VE or VS generally should be consistent with the occupational information supplied by the DOT. When there is an apparent conflict between VE or VS evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE or VS evidence to support a determination or decision about whether the claimant is disabled. At the hearings level, as part of the adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is such consistency.

> Neither the DOT nor the VE or VS evidence automatically "trumps" when there is a conflict. The adjudicator must resolve the conflict by determining if the explanation

24

given by the VE or VS is reasonable and provides a basis for relying on the VE or VS testimony rather than on the DOT information. . . .

When a VE or VS provides evidence about the requirements of a job or occupation, the adjudicator has an affirmative responsibility to ask about any possible conflict between that VE or VS evidence and information provided in the DOT. In these situations, the adjudicator will:

> Ask the VE or VS if the evidence he or she has provided conflicts with information provided in the DOT; and

> If the VE's or VS's evidence appears to conflict with the DOT, the adjudicator will obtain a reasonable explanation for the apparent conflict. . .

When vocational evidence provided by a VE or VS is not consistent with information in the DOT, the adjudicator must resolve this conflict before relying on the VE or VS evidence to support a determination or decision that the individual is or is not disabled. The adjudicator will explain in the determination or decision how he or she resolved the conflict. The adjudicator must explain the resolution of the conflict irrespective of how the conflict was identified.

SSR 00-4p, 2000 WL 1898704, at *2. Though the Sixth Circuit has not definitively resolved the issue, courts within this circuit "tend to hold that the technical error of failing to inquire does not constitute reversible error." *Bratton v. Astrue*, 2010 WL 2901856, at *4 (M.D. Tenn. 2010) (citing *Wix v. Astrue*, 2010 WL 520565, at *7 (M.D. Tenn. 2010); *Fleeks v. Comm'r of Soc. Sec.*, 2009 WL 2143768 (E.D. Mich. 2009); *McEwen v. Astrue*, 2009 WL 5196061, at *4 (M.D. Tenn. 2009)).

Here, in response to the ALJ's varying hypotheticals, the VE suggested the jobs of telemarketer, telephone information clerk, and receptionist. (Tr. 45). The VE said the job of telemarketer is "sedentary, semi-skilled per the DOT," but in actuality is "commonly performed unskilled". (Tr. 45). The DOT classifies the job of telemarketer as sedentary work with one to three months of vocational preparation, and involving occasional handling and frequent fingering, with no requirement for feeling. DICTIONARY OF OCCUPATIONAL TITLES, 1991 WL 672194, § 299.357-014. Similarly, the job of receptionist, said the VE, is sedentary and listed by the DOT as semi-

skilled, though commonly performed as unskilled. (Tr. 45). The DOT classifies it as sedentary, requiring three to six months of vocational preparation, and involving frequent handling and occasional fingering, though with no feeling requirement. DICTIONARY OF OCCUPATIONAL TITLES, 1991 WL 672194, § 237.367-038.

A telephone information clerk, the VE testified, is a sedentary and unskilled job. (Tr. 45). The DOT classifies it as a sedentary job that involves frequent handling, fingering, and feeling, and has no specific vocational preparation requirement "beyond short demonstration". DICTIONARY OF OCCUPATIONAL TITLES, 1991 WL 672194, § 237.367-046.

There are two apparent conflicts between the VE's testimony and the information provided by the DOT. First, the VE gave two jobs he described as "commonly performed unskilled" even though the DOT lists them as semi-skilled. (Tr. 45). Because this conflict was expressly disclosed by the VE, and the ALJ reasonably explained his resolution of the inconsistency (Tr. 20), the ALJ did not fall short of meeting his responsibilities under SSR 00-4p with respect to this conflict.

Second, in the ALJ's hypothetical, he said the hypothetical individual "would be limited to occasional use of the hands for grasping or fine fingering work." (Tr. 45). According to the DOT, each of the three jobs suggested by the VE require either frequent fingering or frequent handling. Therefore, the VE's testimony that a hypothetical individual with the limitations assumed by the ALJ's question could perform the jobs of telemarketer, telephone information clerk, and receptionist is in conflict with the DOT. And unlike the conflict in skill levels, this conflict was not disclosed by the VE in his testimony and was not addressed by the ALJ in his opinion. In fact, the ALJ concluded Plaintiff has an RFC that allows for only "occasional use of the hands for grasping or fine fingering work" (Tr. 15), but yet accepted the VE's testimony that she could perform the jobs of receptionist

and telemarketer (Tr. 20). The ALJ adopted, without explanation, a finding inconsistent with the DOT.

In essence, the ALJ relied on the VE's incorrect testimony to conclude Plaintiff could perform jobs that, according to the DOT and assuming the RFC the ALJ determined she has, she could not perform. This is not the kind of harmless error that results from merely not inquiring about conflicts between VE testimony and the DOT, but the Court need not decide whether it by itself warrants remand, given the necessity for remand already. Because the regulations require the Commissioner to take administrative notice of "reliable job information" in the DOT, 20 C.F.R. §§ 404.1566(d), 416.966(d), this unresolved conflict could result in a finding of fact unsupported by substantial evidence. On remand, the Commissioner should seek to resolve such conflicts and provide reasonable explanation for his resolution of them.

The Commissioner maintains Plaintiff waived this argument by failing to object at the hearing about the inconsistency, but the Commissioner's argument on this point is unavailing. The case within this circuit that the Commissioner cites, *Rosic v. Comm'r of Soc. Sec.*, 2010 WL 3292964 (N.D. Ohio 2010), stands for a completely inapplicable and distinct proposition: that a claimant waives her right to contest the qualifications of a VE after failing to inquire about them at the hearing. *Rosic*, 2010 WL 3292964, at *11. That is not the situation here, where the VE's testimony was factually incorrect.

Moreover, the Seventh Circuit case the Commissioner cites for the proposition that Plaintiff waived any argument about this inconsistency, *Donahue v. Barnhart*, 279 F.3d 441 (7th Cir. 2002), pertained to an application filed before the implementation of SSR 00-4p. In fact, the court noted that "[SSR] 00-4p [was] promulgated in December 2000[, *and thus [is] not directly applicable to*

27

*this case . . .*" *Id.* at 446 (emphasis added). In other words, the Commissioner relies on *Donahue* while *Donahue* makes clear its reasoning was superceded by the promulgation of SSR 00-4p. And SSR 00-4p requires reasonable explanation for "apparent conflicts", "irrespective of how the conflict was identified." SSR 00-4p, 2000 WL 1898704, at *2–4. In this case, the conflict was reasonably apparent on its face; a reasonable person should have sniffed out a possible inconsistency when testimony suggested the jobs of receptionist, telemarketer, or telephone information clerk would not require more than occasional fingering and occasional handling.

On remand, if the Commissioner determines Plaintiff has an RFC that allows for only occasional handling or fingering, then to satisfy the Commissioner's burden at Step Five, different jobs must be used in support lest the Commissioner gives a reasonable explanation for his resolution of this conflict with the DOT.

## CONCLUSION

Following review of the arguments presented, the record, and applicable law, the Court finds the ALJ's decision denying benefits unsupported by substantial evidence. The Commissioner's decision is reversed and the case is remanded to the Commissioner for further proceedings consistent with this opinion.

IT IS SO ORDERED.

      s/James R. Knepp, II          
United States Magistrate Judge
